# Case No. 21-56282

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

DENISE MEJIA, an individual,
*Plaintiff-Appellee,*

v.

WESLEY MILLER, Bureau of Land Management Officer,
in his individual and official capacity,
*Defendant-Appellant,*

and

UNITED STATES OF AMERICA,
*Defendant.*

---

*On Appeal from the United States District Court for the Central District of California (Riverside),
Case No. 5:20-cv-01166-SB-SP • Honorable Stanley Blumenfeld, Jr., District Judge*

## *AMICUS CURIAE* BRIEF OF INSTITUTE FOR JUSTICE IN SUPPORT OF APPELLEE

SCOTT F. REGAN
ANYA BIDWELL
PATRICK M. JAICOMO
**INSTITUTE FOR JUSTICE**
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone: (703) 682-9320
sregan@ij.org • abidwell@ij.org
pjaicomo@ij.org

*Counsel for Amicus Curiae,
Institute for Justice*

 

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned counsel states that the Institute for Justice (IJ) is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

Dated: February 2, 2023

/s/ Scott F. Regan
Scott F. Regan

*Counsel for Amicus Curiae*
*Institute for Justice*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................ii

TABLE OF AUTHORITIES ...................................................................iv

IDENTITY AND INTEREST OF AMICUS CURIAE............................. 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ............................................................................................ 4

I.     The Westfall Act "left *Bivens* where it found it" in 1988. ........... 4

II.    In 1988, when Congress fashioned the Westfall Act, *Bivens* remedies were more expansive than acknowledged today. ........ 9

     a.  In 1988, Congress would have understood *Bivens* to include the Fourth Amendment claims at issue here. ......... 11

     b.  The *Bivens* Court envisioned the "special factors" analysis as a consideration of the federal employment relationship .............................................................. 14

     c.  After *Bivens*, the Court recognized the availability of a *Bivens* remedy in the face of salient opposing factors.......... 15

     d.  *Bush*, *Chappell*, and *Stanley* demonstrate that the *Bivens* Court's concerns animating the "special factors" analysis focused on the federal employee-employer relationship. ..... 17

CONCLUSION ...................................................................................... 21

CERTIFICATE OF COMPLIANCE ....................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) ..................................................................... *passim*

*Bush v. Lucas,*
    462 U.S. 367 (1983) ............................................................ 17, 18, 19

*Butz v. Economou,*
    438 U.S. 478 (1978) ..................................................................... 14, 19

*Brownback v. King,*
    141 S. Ct. 740 (2021) ......................................................................... 1

*Carlson v. Green,*
    446 U.S. 14 (1980) .............................................................. 16, 17, 19

*Chappell v. Wallace,*
    462 U.S. 296 (1983) .................................................... 10, 17, 18, 19

*Davis v. Passman,*
    442 U.S. 228 (1979) ..................................................................... 16, 19

*Egbert v. Boule,*
    142 S. Ct. 1793 (2022) .......................................................... *passim*

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ..................................................................... 14, 19

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ........................................................................ 5, 8

*Hui v. Castaneda,*
    559 U.S. 799 (2010) ............................................................................. 7

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803) ............................................................ 12

*Minneci v. Pollard,*
  565 U.S. 118 (2012) ................................................................... 6-7

*Schowengerdt v. Gen. Dynamics Corp.,*
  823 F.2d 1328 (9th Cir. 1987) ........................................................ 12

*United States v. Gilman,*
  347 U.S. 507 (1954) ............................................................... 15, 18

*United States v. Standard Oil Co. of California,*
  332 U.S. 301 (1947) ............................................................... 15, 18

*United States v. Stanley,*
  483 U.S. 669 (1987) ........................................................... 10, 17, 19

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ................................................................. 5

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV ............................................................ *passim*

## CODES AND RULES

28 U.S.C. § 2679(b) ............................................................. *passim*

Fed. R. App. P. 28(a)(4)(E) ........................................................ 1

Fed. R. App. P. 29(a)(2) ........................................................... 1

## OTHER AUTHORITIES

Anya Bernstein,
  *Congressional Will and the Role of the Executive in Bivens Actions:
  What Is Special About Special Factors?*,
  45 IND. L. REV. 719 (2012) ............................................................ 14, 15

Brief of *Amicus Curiae* Institute for Justice in Support of Respondent,
  *Egbert v. Boule*, No. 21-147 (S. Ct. Jan. 26, 2022)................................ 1

*Developments in the Law: Remedies Against the United States and
  Its Officials*, 70 HARV. L. REV. 827 (1957) ........................................... 6

H.R. REP. NO. 100-700 (1988),
  *reprinted in* 1988 U.S.C.C.A.N. 5945 ................................................5-6

Institute for Justice, *Constitutional GPA* (June 30, 2022),
  https://ij.org/report/constitutional-gpa/ ................................................. 1

Patrick Jaicomo & Anya Bidwell,
  *Recalibrating Qualified Immunity: How* Tanzin v. Tanvir*, Taylor v.
  Riojas*, and McCoy v. Alamu *Signal the Supreme Court's Discomfort
  with the Doctrine of Qualified Immunity*,
  112 J. CRIM. L. & CRIMINOLOGY 105 (2022) ......................................... 1

PAUL M. BATOR ET AL.,
  HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL
  SYSTEM 926-35 (3d ed. 1988) ............................................................. 16

Stephen I. Vladeck,
  *The Disingenuous Demise and Death of* Bivens,
  2020 CATO SUP. CT. REV. 263 (2020) .................................................... 7

**IDENTITY AND INTEREST OF AMICUS CURIAE**[1]

The Institute for Justice (IJ) is a nonprofit, public-interest law firm dedicated to securing greater protection for individual liberty. IJ is a leading advocate on doctrines that impede enforcement of constitutional rights, including governmental immunity. IJ litigates cases (e.g., *Brownback v. King*, 141 S. Ct. 740 (2021)), files *amicus* briefs in the Supreme Court and federal circuit courts (e.g., Brief of *Amicus Curiae* Institute for Justice in Support of Respondent, *Egbert v. Boule*, No. 21-147 (S. Ct. Jan. 26, 2022)), publishes scholarship (e.g., Patrick Jaicomo & Anya Bidwell, *Recalibrating Qualified Immunity: How* Tanzin v. Tanvir*, Taylor v. Riojas*, *and* McCoy v. Alamu *Signal the Supreme Court's Discomfort with the Doctrine of Qualified Immunity*, 112 J. CRIM. L. & CRIMINOLOGY 105 (2022)), and conducts nationwide research (e.g., Institute for Justice, *Constitutional GPA* (June 30, 2022), https://ij.org/report/constitutional-gpa/). IJ's mission includes removing barriers to the enforcement of individual rights. As such, IJ has an

---

[1] No party's counsel authored any part of this brief, and no one other than *amicus* contributed money for this brief's preparation or submission. *See* Fed. R. App. P. 28(a)(4)(E). The Appellee, Denise Mejia, consented to the filing of this brief. The Appellant, Wesley Miller, declined to consent. *See* Fed. R. App. P. 29(a)(2) and Motion for Leave *attached*.

1

interest in this Court's considering whether to rehear this case *en banc*, which, among other things, will allow this Court to properly review and address the text and history of the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act.

## SUMMARY OF ARGUMENT

The Supreme Court, in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), held that whether Congress has sanctioned a damages remedy in a given context is determinative in assessing the availability of a *Bivens* cause of action. *Id.* at 1803 (explaining the necessity of "utmost deference to Congress' preeminent authority" in providing a damages remedy). If an act of Congress authorizes a *Bivens* claim, the inquiry ends—because Congress has made the definitive assessment, a court need not assess any "special factors." *See Egbert*, 142 S. Ct. at 1803. In a case like this, therefore, the fundamental question under *Egbert* is whether Congress has spoken on the issue. And in this case, contrary to the panel opinion, Congress has spoken by endorsing the claims brought by Appellee.

In short, a fair interpretation of the Westfall Act must lead to the conclusion that Congress preserved a *Bivens* remedy for excessive-force claims, like the claim recognized in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Those claims are conspicuously echoed here. Moreover, no "special factor" the Court had identified before enactment of the Act is remotely present here. What we have here, instead, is a straightforward Fourth Amendment claim of the

3

type recognized in *Bivens*: an individual—in this case a woman seated as a passenger in an open-air vehicle—subjected to excessive force by a federal law-enforcement officer. And it is this kind of violation for which Congress crafted a remedy in the Westfall Act.

Because Congress, through the Westfall Act, affirmatively secured *Bivens* claims like Appellee's, the panel erred in concluding that Appellee's Fourth Amendment claims must be dismissed. This Court should rehear this appeal *en banc* to affirm the availability of Appellee's *Bivens* claim and thus align itself with Congress's evident intent.

## ARGUMENT

### I.    The Westfall Act "left *Bivens* where it found it" in 1988.

This case arises from the shooting of an unarmed passenger in a utility-terrain vehicle ("UTV"). The shooter, a law-enforcement officer employed by the Bureau of Land Management, hit Appellee with two bullets during an attempted seizure. At the time, the officer suspected Appellee's husband—the driver of the UTV—to have, hours earlier, committed a traffic violation. Appellee sued the officer, seeking redress for violations of her Fourth Amendment rights, which included an excessive-force *Bivens* claim—the same claim recognized by the Supreme

Court in *Bivens*. Despite this apparent affinity, the panel dismissed Appellee's claim, in contravention of Congress's plain prescript in the Westfall Act and the Supreme Court's instruction in *Egbert* to defer to Congress's will.

With the Westfall Act, Congress preserved the right to bring "a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States." Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified at 28 U.S.C. § 2679(b)) (Westfall Act); 28 U.S.C. § 2679(b)(2)(A). This was an express exception to the Act's exclusivity rule that otherwise made the Federal Tort Claims Act ("FTCA") the sole remedy available for tort claims within the FTCA's scope. *See* 28 U.S.C. § 2679(b)(1). By crafting this exception, Congress, as the Supreme Court recently recognized, "left *Bivens* where it found it," *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020), securing the availability of these constitutionally critical remedies. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–57 (2017).

Congress's manifest aim in including the constitutional-torts exception in the Westfall Act was to preserve *Bivens* claims. H.R. REP.

5

No. 100-700, at 6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5949–50. A report from the House Committee on the Judiciary pointedly noted that this "major feature" of the Act was necessary because, since *Bivens*, "the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention." *Id*. In so doing, the Committee emphasized that the Act secured existing claims against federal officials for unconstitutional acts. *Id*.

Congress's action sought to maintain a system of accountability that existed for centuries. Since the Founding, injured parties could bring state common-law tort suits against federal officials who violated the Constitution. *See Developments in the Law: Remedies Against the United States and Its Officials*, 70 HARV. L. REV. 827, 831–32 (1957) (explaining the historical availability of damages suits against government agents who exceeded their authority and noting that federal agents could avoid liability only where "the action in question [was] authorized by a constitutional act of Congress"). The Westfall Act transformed this status quo in one key respect: Since its passage, courts have consistently held that the Act precludes state-law tort claims against federal actors, even for constitutional violations. *See Minneci v. Pollard*, 565 U.S. 118, 126

(2012) (citing the Westfall Act for the proposition that "[p]risoners ordinarily *cannot* bring state-law tort actions" against federal agents).

As a result, the Westfall Act might have raised serious constitutional concerns by closing off all remedies for a constitutional violation by federal officials. *See* Stephen I. Vladeck, *The Disingenuous Demise and Death of* Bivens, 2020 CATO SUP. CT. REV. 263, 280–81 (2020). For those plaintiffs without a viable statutory remedy, the preclusion of state-law tort claims could have meant that damaging constitutional infringements would go unredressed. *See Abbasi*, 137 S. Ct. at 1856–57 (explaining that *Bivens* "vindicate[s] the Constitution by allowing some redress for injuries"). But Congress expressly evaded this injustice with the Westfall Act by guaranteeing the right to remedy a constitutional violation through a *Bivens* cause of action. *See* 28 U.S.C. § 2679(b)(2).

Effectively, the Westfall Act's "explicit exception for *Bivens* claims," *Hui v. Castaneda*, 559 U.S. 799, 807 (2010), resolutely ratified that these remedies, insofar as they existed at the time of the law's passage, would endure unimpaired. To properly comply with the Court's dictate in *Egbert* to defer to Congress, therefore, courts must recognize those *Bivens* claims that Congress endorsed in the Act.

The Supreme Court's opinion in *Hernandez* supports this reading of the Act. 140 S. Ct. 735. There, the Court held that no *Bivens* remedy was available to the family of a teenager who was shot by a border patrol agent across the Texas-Mexico border. *Id.* at 739–40. In so doing, the Court reasoned that the Westfall Act was "not a license to create a new *Bivens* remedy in a context we have never before addressed." *Id.* at 748 n.9. However, in response to an argument proffered by *amicus* in that case,[2] the Court acknowledged that the Act "simply left *Bivens* where it found it"—reflecting Congress's goal to safeguard the availability of *Bivens* remedies. *Id.* Importantly, where Congress "found" *Bivens* at such time was as a doctrine that specifically acknowledged the right to redress

---

[2] While the Court rejected *amicus*'s broader argument in *Hernandez* that Congress "intended for a robust enforcement of *Bivens* remedies," 140 S. Ct. at 749 n.9, it nonetheless acknowledged that, with the Act, "Congress made clear that it was not attempting to abrogate *Bivens*," *id.* Since *Hernandez*, the Court further clarified that, unlike its analysis in *Hernandez*, the "single question" in a *Bivens* inquiry is whether there is "any reason to think Congress might be better equipped" than a court to "create a damages remedy." *Egbert*, 142 S. Ct. at 1803; *see also id.* at 1809 (Gorsuch, J., concurring in the judgment) (noting that the *Bivens* inquiry "boils down to a single question: Is there any reason to think Congress might be better equipped than a court to weigh the costs and benefits of allowing a damages action to proceed?" (internal quotations omitted)).

for Fourth Amendment claims like those raised by Appellee. *See Bivens*, 403 U.S. at 397.

If Congress had intended to forestall further application of the Fourth Amendment-based claims in *Bivens* and other comparably prominent cases permitting damages under the Fourth Amendment, it could have said so. After all, the Westfall Act definitively foreclosed other, similar causes of action. *See* 28 U.S.C. § 2679(b)(1) (expressly precluding any "other civil action or proceeding for money damages" on the particular subject matter and thereby requiring suit under the FTCA). But Congress did no such thing. Rather, Congress spoke expansively and plainly in securing the claims already then continually and unequivocally recognized by courts—including, most conspicuously, causes of action for violations of the Fourth Amendment as brought by Appellee here.

## II. In 1988, when Congress fashioned the Westfall Act, *Bivens* remedies were more expansive than acknowledged today.

In 1988, Congress "found" *Bivens* as a doctrine where the availability of a remedy was the rule and departures from this rule were exceptional. With the Westfall Act, Congress had no need to stipulate the precise circumstances in which it preserved *Bivens* claims because the

Supreme Court's patent construction of *Bivens* at the time Congress enacted the Act established how Congress would have expected courts to understand the law.

When the House of Representatives received the Act's text, the Supreme Court had addressed only eight cases involving *Bivens* claims. The Court's opinions in these cases are no hodgepodge of indefinite doctrine. Rather, these precedents demonstrated that the availability of a *Bivens* claim to remedy constitutional violations should be assumed, except in rare cases directly implicating the scope and nature of the federal employment relationship. *See, e.g., Chappell v. Wallace*, 462 U.S. 296 (1983); *United States v. Stanley*, 483 U.S. 669 (1987).

Outside of the federal-employment context, the Court had, before Congress enacted the Westfall Act, applied *Bivens* without hesitation. Infringements of individual Fourth Amendment rights—the very violations giving rise to the concept of a *Bivens* claim—were paramount in both the public consciousness and the courts' jurisprudence as to *Bivens* remedies in 1988. And this is the background to Congress's decision to preserve *Bivens* in the Westfall Act. At that time, Congress could not have foreseen the specific facts the Court might grapple with in

10

future cases. But Congress undoubtedly understood that the universe of constitutional violations greatly exceeded the skeletal constellation of unique cases then examined by the Court.

### a. In 1988, Congress would have understood *Bivens* to include the Fourth Amendment claims at issue here.

As the Supreme Court proleptically noted in *Bivens*, the principle that "damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition." 403 U.S. at 395. By contrast, Congress in 1988 would have indeed been surprised by the idea that the Fourth Amendment violations at issue in *Bivens*—including the same excessive-force claim raised by Appellee in this case—were somehow beyond the preservation enacted by Congress in the Westfall Act. But that is what the panel's opinion implicitly assumed.

The petitioner in *Bivens*, just like Appellee here, asserted that law-enforcement officers acting under claim of federal authority violated the Fourth Amendment by using "unreasonable force" during an arrest. *Id.* at 389. In affirming Chief Justice Marshall's declaration that the "very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an

11

injury," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), the Court held that the petitioner was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment." *Bivens*, 403 U.S. at 397. The Court's opinion limits the facts of the arrest to one short paragraph. *See id.* at 389. Far more critical to the Court was the constitutional infringement itself. *See id.* at 395–97.

Building on the Supreme Court's decision in *Bivens*, courts across the country, over the succeeding seventeen years, continued to authorize *Bivens* remedies when federal officers violated the Fourth Amendment—including this Court. *See Schowengerdt v. Gen. Dynamics Corp.*, 823 F.2d 1328, 1337 (9th Cir. 1987) (holding that the plaintiff "may pursue his claim for damages [against federal actors] based on violations of his constitutional right to be free from unwarranted searches and seizures"). While courts might, from time to time, grapple with so-called "special factors" that had been identified by the Court at that time, *see* Part II.b–d *infra*, they did not engage in fussbudgety side-by-side comparisons of discrete facts—what counted, instead, was whether the defendant had in fact violated the Constitution and caused an injury. *See Schowengerdt*, 823 F.2d at 1335–37 (assessing the reasonableness of the alleged search

and potential "special factors," but omitting any analysis of whether the constitutional violation involved facts cognate to prior cases involving *Bivens* remedies).

As a result, when Congress passed the Westfall Act, it would have understood *Bivens*—and hence the constitutional claims preserved by the Act—to include generic causes of action for excessive force by federal agents. That is the claim raised by Appellee here: an uncomplicated Fourth Amendment violation, just as in *Bivens*.

Simply put, because the Court had not then suggested that the claims in *Bivens* were limited to its precise facts[3]—i.e., Federal Bureau of Narcotics officers, a Brooklyn apartment, a man strip-searched while manacled—Congress's decision to preserve *Bivens* claims in the Westfall Act cannot be assumed to have salvaged only claims exactly mirroring the three distinct contexts in which the Court had, by 1988, affirmatively recognized the availability of a damages remedy. Congress accomplished much more, and its act should be executed in accord with the Court's recognition of Congress's preeminence in *Egbert*. In this case, that means

---

[3] To further stress the point, *amicus* is not aware of any court at any level that had, by 1988, indicated that *Bivens* claims should be so construed.

only that Appellee's Fourth Amendment excessive-force claim, like in *Bivens*, should be recognized as viable, without regard to any new-found "special factors."

> **b. The *Bivens* Court envisioned the "special factors" analysis as a consideration of the federal employment relationship.**

From *Bivens* through enactment of the Westfall Act, the Court assumed that constitutional violations warranted a remedy. *See Butz v. Economou*, 438 U.S. 478, 486 (1978) (addressing the immunity of federal officials and assuming *Bivens* applied to different constitutional contexts); *accord Harlow v. Fitzgerald*, 457 U.S. 800, 802–05 (1982); *see also* Anya Bernstein, *Congressional Will and the Role of the Executive in* Bivens *Actions: What Is Special About Special Factors?*, 45 IND. L. REV. 719, 734 n.87 (2012) (noting that if a damages remedy is available for "violations of some constitutionally guaranteed individual rights," it should be available for all such rights because "the Constitution does not guarantee some individual rights less vigorously than others."). Only as "a seeming afterthought," *id.* at 731, did the *Bivens* Court mention the absence of "special factors counseling hesitation," 403 U.S. at 396.

14

Though the Court did not specify what "special factors" require consideration, it cited two cases as examples: *United States v. Standard Oil Co. of California*, 332 U.S. 301 (1947), and *United States v. Gilman*, 347 U.S. 507 (1954). Bernstein, *supra*, at 731–33. The common theme of these two cases suggests only a limited concern with intruding on Congress's authority to define the parameters of the government's relationship with federal employees—the sole concern the Court would emphasize in *Bivens*'s wake.[4]

### c. After *Bivens*, the Court recognized the availability of a *Bivens* remedy in the face of salient opposing factors.

In its first two post-*Bivens* cases, the Court endorsed a vigorous view of the doctrine, recognizing the availability of a *Bivens* remedy

---

[4] In *Standard Oil*, the Court refused to create a cause of action allowing the government to sue a corporation whose employee had injured a soldier. 332 U.S. at 314. The Court's decision rested on its recognition that "[p]erhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces." *Id.* at 305. The Court thus concluded that permitting the cause of action would unduly intrude on Congress's authority to define the government's relationship with its soldiers. *Id.* at 316–17.

Likewise, in *Gilman*, the Court declined to create a common-law cause of action that would force a federal employee to indemnify his employer, the federal government. 347 U.S. at 508–13. The Court expressed concern that "[t]he relations between the United States and its employees have presented a myriad of problems with which the Congress over the years has dealt," *id.* at 509, and thus deferred to Congress's authority to craft appropriate policy.

despite salient opposing factors. *See Davis v. Passman*, 442 U.S. 228, 245–47 (1979); *Carlson v. Green*, 446 U.S. 14, 18–19 (1980). These cases suggest that the special factors analysis is limited to the concerns articulated by the *Bivens* Court, and, even then, this analysis favors recognition of a remedy.

In *Davis*, a congressman's assistant sought damages for alleged sex discrimination in violation of the Fifth Amendment. *Davis*, 442 U.S. at 230–31. The Court concluded that, if the plaintiff prevailed on the merits, she would be entitled to a *Bivens* remedy. *Id.* at 248. As for the "special factors" analysis, the Court, in largely bypassing the concerns identified in *Bivens*, held that any such special factors were "coextensive with the protections afforded by the Speech or Debate Clause." *Id.* at 246.

As a leading contemporary federal courts textbook noted, *Davis* reflects a narrow view of the "special factors" analysis. *See* PAUL M. BATOR ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 926–35 (3d ed. 1988) ("Are there many cases which would present *more* difficult obstacles to the inferring of a cause action [than *Davis*]?"). The Court's decision in *Davis*, then, demonstrates that

16

even when addressing the *Bivens* Court's original concerns—the federal employment relationship—the special factors test was not intended as an exception that presumptively defeats the rule.

The Court's opinion in *Carlson* is similarly instructive. There, a prison inmate sought damages from federal prison officials who allegedly failed to provide medical care in violation of the Eighth Amendment. *Carlson*, 446 U.S. at 14. The Court pronounced that *Bivens* establishes the "right to recover damages against [federal officials] in federal court despite the absence of any statute conferring such a right." *Id.* at 18. As for special factors, notwithstanding potential issues of prison security and personnel, the Court expressed no misgivings: "th[is] case involves no special factors counselling hesitation." *Id.* at 19. Moreover, as Justice Powell noted in a concurrence, *Carlson* negates any notion that one's status as a federal official is a special factor. *Id.* at 27 (Powell, J., concurring in the judgment).

> ### d. *Bush*, *Chappell*, and *Stanley* demonstrate that the *Bivens* Court's concerns animating the "special factors" analysis focused on the federal employee-employer relationship.

The Supreme Court's decisions in the three *Bivens*-related cases it addressed before Congress received the text of the Westfall Act all

comport with the *Bivens* Court's original concern for intruding on the federal employee-employer relationship. As such, these cases explain, without expanding, the circumstances that "counsel[] hesitation" for recognizing *Bivens* remedies.

Far from a retreat from *Bivens*, *Bush v. Lucas*, 462 U.S. 367 (1983), reflects the *Bivens* Court's limited "special factors" concern. There, the Court affirmed the dismissal of a federal engineer's *Bivens* claims "[b]ecause such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions . . . ." *Bush*, 462 U.S. at 368–69. The Court recognized that, as in *Standard Oil* and *Gilman*, the case concerned "the relations between the Government and its employees." *Id.* at 380. The Court thus summarized the history of Congress's activity in defining the scope of the federal employment relationship, including employees' rights and remedies, and concluded that "Congress is in a far better position" to assess the impact of new legal remedies on "the efficiency of the civil service." *Id.* at 389.

In *Chappell*, the Court carried this rationale to the military. There, enlisted sailors sued superior officers alleging unconstitutional discrimination. *Chappell*, 462 U.S. at 297. Concluding that the

relationship between sailors and superiors is core to "the necessarily unique structure of the military establishment," the Court accepted the relevance of the special factors analysis. *Id.* at 300. After surveying Congress's "plenary constitutional authority" over the military, the Court concluded that "the unique disciplinary structure of the military establishment" and Congress's "activity in the field" were special factors weighing against allowing a *Bivens* remedy. *Id.* at 302–04.

Finally, in *Stanley*, the Court clarified that its holding in *Chappell* applied to any damages claims incident to military service. *Stanley*, 483 U.S. at 678–86. As in *Chappell*, the Court stressed the Constitution's insistent grant of authority over the military "upon the political branches," i*d.* at 682, and consequently proposed a more "prophylactic" conception of the special factors analysis in the military context to avoid any "intrusion upon[] military matters," *id.* at 681–83.

In the end, when the House received the text of the Westfall Act, the Court had recognized the availability of *Bivens* claims in three cases (*Bivens*, *Davis*, and *Carlson*); assumed the availability of *Bivens* claims in two cases (*Butz* and *Harlow*); and refused to recognize *Bivens* claims only in suits brought by federal employees (*Bush*, *Chappell*, and *Stanley*).

This is where Congress "found" *Bivens* when it preserved constitutional claims against federal officials.

*   *   *

Because the Supreme Court has expressed the view that Congress is "better equipped" than a court "to create a damages remedy," *Egbert*, 142 S. Ct. at 1798, and Congress expressly sanctioned damages remedies in the Westfall Act, both the Act and *Egbert* require courts to confirm the scope of this congressionally approved remedy in a case like this. Congress, in 1988, did not find *Bivens* as a doctrine roiling in uncertainty. Rather, Congress "found" a doctrine where remedies for constitutional violations—including and especially under the Fourth Amendment—were presumptively available absent a single then-recognized "special factor." To assume that Congress aimed only to endorse damages claims in a smattering of fact-specific circumstances then confronted by the Court requires one to ignore the legible background in which Congress legislated.

As the Court stipulated, under *Egbert* Congress's "preeminent authority" deserves deference. In this case, this deference demands only that this Court engage with the constitutional violation alleged. Because

20

Congress would have understood that excessive-force claims of the type endorsed in *Bivens*—and repeated here, with an innocent passenger shot in an attempted arrest—would remain available through the Westfall Act, no matter the federal law-enforcement agency involved, the violation of Appellee's rights warrants redress.

## CONCLUSION

The Court should rehear this appeal *en banc* and affirm the district court's denial of Appellant's summary judgment motion.

Dated: February 2, 2023

/s/ Scott F. Regan
Scott F. Regan
Anya Bidwell
Patrick M. Jaicomo
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
sregan@ij.org
abidwell@ij.org
pjaicomo@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

# FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

## 9TH CIR. CASE NUMBER 21-56282

I am the attorney or self-represented party.

**This brief contains 4,035 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Scott F. Regan          **Date** February 2, 2023

22